851 F.Supp. 1350 (1994)
Rhonda KRISS, Plaintiff,
v.
SPRINT COMMUNICATIONS COMPANY, LIMITED PARTNERSHIP, Defendant.
Civ. No. 4-92-272.
United States District Court, D. Minnesota, Fourth Division.
April 1, 1994.
*1351 Susan M. Robiner, Kathleen M. Graham, Leonard Street & Deinard, Minneapolis, MN, for Rhonda M. Kriss.
Sarah D. Halvorson, David Alan Allgeyer, Lindquist & Vennum, Minneapolis, MN, Lee J. Hollis, Sprint Corp., Kansas City, MO, for Sprint Communications Co., Ltd. Partnership.

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT
DIANA E. MURPHY, Chief Judge.
This action arises out of the decision of defendant Sprint Communications Company (Sprint) not to transfer plaintiff Rhonda Kriss to the New Business Management Group (New BMG) in September 1990. Plaintiff brought this action for gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Minnesota Human Rights Act, Minn. Stat. § 363.03, alleging that Sprint did not transfer her to the new organization because she was a woman. Trial was held on 11 days with 24 witnesses and numerous exhibits.[1] The parties subsequently submitted briefs and proposed findings. After carefully considering the evidence at trial and the legal arguments made, and based upon observation of the witnesses and their credibility, the court now submits its findings of fact and conclusions of law in memorandum form pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

I.
Before her employment with Sprint, plaintiff Rhonda Kriss was a National Account Representative with Copy Duplicating Products (CDP) selling facsimile products. She had also worked for six months as a sales representative for Fujitsu, a PBX manufacturer[2], two years with NORSTAN a PBX distributor, and three and one-half years as a sales representative for Honeywell's telecommunications division. Plaintiff thus had *1352 more than six years of experience in the telecommunications industry when she was hired by Sprint.
Sprint is the third largest provider of long distance service in the United States. It has an office in Minneapolis that markets its services in the Twin Cities and surrounding areas. Prior to September 1990, the sales force was divided into two groups: 1) the National Accounts Division (NAD) which sold to the largest customers that billed over $100,000 dollars per month; and 2) the Business Market Group (BMG) which marketed to customers who billed over $1,000 per month.
Margie Bingham was the manager of the NAD. She began her employment as a National Account Manager salesperson in April 1986 and was promoted to be the NAD Manager for Minneapolis in January 1988. Bingham reported to her Regional Director, Marilyn Deas.
The BMG was divided into two districts, each with its own manager. In 1988, the manager for District I was Scott Miller. Miller began with Sprint as a Major Account Representative (MAR) in Omaha in 1987 and was promoted to manager of the Minneapolis District I in April, 1988. The manager of District II was Debbie Malinski. When she left the position in late 1988, Bob Spears became the manager of District II. Spears was subsequently replaced by Jay Anders in approximately April, 1990. Both district managers reported to the Regional Sales Director, Ryan Sothan, who was also based in Minneapolis.
The NAD and BMG were separate organizations. In the NAD, sales representatives called National Account Managers (NAM), had their own sales support staff. NAD also had its own technical support personnel in Minneapolis. The NAMs worked from a list of identified customers and prospects.
The BMG consisted of sales people called Account Representatives or Major Account Representatives who were responsible for both selling and maintaining accounts not on the NAD list. The BMG representatives shared support staff, and all customer service support came from Star Representatives located outside of Minnesota. In 1988, all the BMG representatives were assigned geographic territories by zip codes. Later, some BMG representatives became "list driven reps" and worked from a list of designated accounts. The relationship between the NAD and the BMG was strained. Disputes over accounts sometimes developed, and tension existed regarding NAD's more extensive support staff and the prestige associated with calling on the largest accounts.
The Minneapolis BMG hired 8 new sales representatives in 1988, including Major Account Representatives Mary Nagle, Rick Berg, Sherry Piscazio, Steve Conlin, Randy Bryson, Jay Anders, and the plaintiff, Rhonda Kriss. Jim Lysinger was also hired as an Account Representative.
Kriss was hired by Scott Miller and was assigned to his sales team. Kriss was a successful salesperson in the BMG and consistently exceeded her quotas. In 1989, her first full year with Sprint, she was ranked second in the Minneapolis office in real revenue as her sales reached 164% of her real revenue quota. Real revenue represents revenue actually received, as opposed to booked revenue which is credited when the order is written but is not necessarily all realized. Kriss performed at 360% of booked revenue in 1989, ranking her fourth in the entire West Division (United States west of the Mississippi). Through July 1990, shortly before the reorganization, Kriss was first in the Minneapolis office at 444% of booked revenue and second in real revenue at approximately 160% of quota.
Kriss was recognized for her performance in a number of ways. In 1989 she was selected for the President's Club, an achievement club based on sales performance. Selection included a free trip to Florida to attend the club meeting. She also won an incentive trip to Vail, Colorado for her booked revenue performance. In 1990, Kriss was again eligible for the President's Club, and won an incentive trip to Palm Springs, CA for the "Western Pro Bowl" in the Sprint "Fantasy Football League", a sales incentive promotion based on sales performance. During her time with Sprint Kriss received letters of appreciation from Scott Miller, Ryan Sothan, and several customers for outstanding performance.
*1353 Like the accounts of other BMG representatives, Kriss's accounts did experience some problems. Billing problems were a major issue a Sprint at this time. All the representatives at trial testified that billing problems such as incorrect charges or the failure of bills to reflect certain credits were commonplace and an issue of great concern to customers. Some problems were caused by Sprint's billing system, while others were the result of human error in either writing the orders or in processing. Part of the representative's job was to coordinate with Sprint management and support staff to resolve such problems and keep the customers happy.
Kriss was responsible for some of the problems on her accounts. For example, customer A.M. Miller experienced a situation where all of its 800 calls were routed into the main console. This caused the calls to stack up, and calls were lost or rang numerous times before being answered. The misrouting of the calls was caused by an incorrect phone number on the order form. There was also at least one instance of miscommunication with a customer. The president of Real Estate Support Services, Bruce Frimerman, wrote a memo to Sprint's president, Ron LeMay, expressing its dissatisfaction with Sprint and accusing Kriss of unethical sales tactics and misrepresentations regarding eligibility for certain discount programs. Sprint's own investigation cleared Kriss of any misrepresentation, but concluded there may have been a miscommunication between Kriss and the customer that caused problems.
On the whole, however, Sprint has not shown that the problems associated with Kriss' accounts were significantly different from those associated with the accounts of the other representatives. The evidence indicating problems on her accounts is offset by the evidence of positive relationships with customers and evidence indicating that all the sales representatives had accounts with billing problems. While some of Kriss' customers expressed concern over problems, others praised Kriss for her support and timely response to issues. Her revenue numbers show Kriss was very successful in sales performance and consistently exceeded her quotas. Her sales ranked her in the top 2 or 3 in the Minneapolis office. The court observed her to be a bright, intelligent and articulate person. Her success as a salesperson in the old BMG demonstrates that she had comparable skills to the representatives eventually chosen to transfer, and that she was qualified for a position in the New BMG.[3]
Part of the district manager's job is to mentor the representatives and provide assistance for sales presentations and resolution of customer problems and complaints. Scott Miller was plaintiff's manager. The evidence shows that Miller was not as supportive of Kriss as he was of male representatives. The testimony established that Miller was less available to women representatives in both professional and social settings, and support staff resources were unequally distributed between the male representatives and Kriss. Support staff was often unavailable when sought by Kriss. Miller also had a poor record of retaining women sales representatives. Of the 4 women who were assigned to his team while he was District Sales Manager in Minneapolis, none was promoted while in his group and all have left the company.
Miller contributed to a male dominated atmosphere in the workplace. Testimony shows he often discussed sports with the men *1354 representatives but not the women. Miller had the "tie lady", a woman that worked at a men's clothing retailer, bring samples of ties into sales meetings, and offered as a sales incentive a gift certificate for a men's clothing store.
Miller also made comments showing a stereotypical attitude toward the roles of men and women. At the Western Pro Bowl awards dinner, Miller made comments to the effect that certain representatives were the best and that others were "not ready to run with the stallions". There was also testimony that Miller made evaluative comments about the physical appearance of women in the office. Miller denied making some of these statements, and claimed at trial that he did not even know what a stallion was. The court did not find his testimony on these points to be credible.
In February 1990 an incident arose surrounding Kriss' handling of The Roach Organization (TRO) account. Kriss and representatives from the other major long distance carriers (AT & T and MCI) had been involved for some time in sales proposals for TRO's long distance business. TRO was a very demanding customer that requested pricing and technical information on a wide variety of possible long distance systems. To aid in its decision-making process, TRO hired a long distance consultant, Charlie Berkowitz. Consultants like Berkowitz normally take the lead role in negotiating with various long distance vendors.
By February 1990, TRO had not decided which carrier it would select or even what type of long distance system it would use. Because of time constraints and the desired implementation date, TRO decided to place orders with three carriers with the understanding that the two carriers that were not selected would have to cancel the orders later. On February 15, 1990, Kriss approached the sales support staff in the National Accounts Division with a Virtual Private Network (VPN) order for TRO.
VPNs are large, complex systems attractive to certain customers with high frequency calling patterns. Such systems are usually purchased only by the largest customers, so all the VPN support assets were located in the National Accounts Division. BMG representatives had recently been approved to market VPNs to appropriate customers. BMG representatives working on a VPN order were to coordinate support with National Accounts personnel. In this case, Miller and Kriss requested National Accounts support from Margie Bingham in January 1990. Bingham indicated that support could be coordinated through Peggy Galvin, a National Accounts Manager. As stated earlier, all National Accounts Managers had their own support staff. Galvin's staff consisted of Maureen Fahey and Bonnie Shay.
After learning that TRO would place orders with all three carriers, Kriss began the order paperwork for TRO. At approximately 4:00 p.m. on Thursday February 15, 1990, Kriss approached Peggy Galvin for assistance in completing the orders. Galvin brought in Fahey and Shay to assist. Kriss indicated that she needed to expedite the order and that the order would have to go out right away to make the March 15 installation date. She did not explain that the customer was placing similar orders with two other carriers.
When Fahey reviewed the paperwork Kriss had started, she noticed that there was a lot of information missing and that there were no signature pages. Kriss indicated that the customer had not yet selected a PBX vendor and "default information"[4] should be entered. Kriss also indicated that she would be meeting with the customer to get the missing information and signatures. Galvin, Fahey, and Shay all testified that if they had known that orders had been placed with three different carriers and that Kriss was making a sales presentation to TRO the next day, they would not have interrupted their work on the other orders they were processing to work on TRO.
An expedited order is an order that must be implemented faster than normal and must be approved by upper management. After Kriss left the TRO paperwork, Bonnie Shay *1355 coordinated with Patti Manuel to obtain approval for an expedite. Sprint VPN orders are all processed in Atlanta, GA. Fahey and Shay testified they planned on sending the orders via overnight delivery. Late pick-up was available in the evening. Galvin, Fahey, and Shay all testified that Fahey and Shay stayed until approximately 8:00 to 8:30 p.m. that evening in an attempt to get the order out, but that Kriss never returned with the necessary information or signatures. Shay and Fahey left various voice mail messages with Kriss asking for the additional information.
Unknown to Galvin, Fahey, and Shay, Kriss was experiencing problems with her daughter who was in the hospital for psychological reasons. After leaving the TRO materials with the NAD staff, Kriss went to the hospital and visited her daughter until returning to the Sprint offices at approximately 9:00 p.m. She remained at the office until around midnight working on her sales presentation for the next day.
The next day Kriss, Scott Miller, and Account Consultant Nancy Matoon made a sales presentation to TRO. Kriss informed Miller that TRO had placed orders with three carriers and that the carriers who did not get the contract would have to cancel their orders. She also informed him that she had submitted the order paperwork to the NAD staff.
At the end of the meeting, TRO had still not decided on a carrier or type of system. Kriss, Miller and Matoon discussed the meeting on the way out to their cars, and Matoon expressed frustration because the customer did not seem to know what it wanted. From the meeting, Kriss left on a previously scheduled and approved long weekend. Neither Kriss, Miller, nor Matoon contacted the NAD support staff regarding the expedited order request. No one updated the NAD staff on the status of the orders, followed up on the missing data on the order forms, or further explained the contingent nature of the orders.
While plaintiff was out of the office, Fahey and Shay continued to attempt to reach her regarding the missing information on the TRO paperwork. On Monday or Tuesday of the following week, Shay encountered Matoon in the restroom and inquired about the TRO orders. Matoon indicated that she did not know what service the customer wanted and that she would get back in touch with Shay. Approximately fifteen minutes later, Matoon called Shay and indicated the customer had not decided on VPN service. Nancy Matoon canceled the VPN orders that day at the direction of Regional Director Ryan Sothan, who felt they were premature.
Galvin, Shay, and Fahey were extremely upset with Kriss. They testified that they felt they had been poorly used and not treated as equals. The three met with their manager, Margie Bingham, to express their dissatisfaction. Bingham wrote a heated memo to Scott Miller describing her impression of the incident and her anger at the way she perceived her staff members had been treated.
Miller met with Ryan Sothan to discuss Bingham's memo. Both testified that they initially felt Bingham was overreacting. Miller and Sothan then met with Bingham. Miller explained the family stress Kriss was under at the time. He did not explain the way TRO placed orders with three carriers, or that he had had knowledge that the paperwork was submitted before the Friday morning presentation to TRO.
Miller and Sothan also met with Kriss. This meeting did not take place until approximately three weeks after the incident. Miller read excerpts of the Bingham memo to Kriss, but denied her request to see it. Miller and Sothan instructed Kriss to apologize to Fahey and Shay and to focus on maintaining her existing accounts for the next two months. They also instructed Kriss not to speak with Margie Bingham. Miller indicated he would "straighten things out." Kriss subsequently had a chance encounter with Peggy Galvin, who said Shay and Fahey were very upset and that Kriss should apologize. Kriss did apologize and gave Shay and Fahey some cookies as a gift. Shay and Fahey testified they did not want the cookies, and Shay did not feel the apology was sincere.
In September 1990 Sprint reorganized its sales force. A new division, the "New BMG", was created to service non-NAD accounts *1356 over $10,000. The focus of the division was to grow the business in these existing accounts. The "old BMG" was to be renamed the National Sales Division (NSD) and would focus on sales to new customers with under $10,000 per month average billings.
In the spring of 1990, discussions began at Sprint over the structure for the reorganization, what accounts to transfer to the New BMG, and which account representatives should move to the new group. Marilyn Deas asked Margie Bingham to identify accounts and representatives to transfer to the New BMG. Deas had the final decision, but would rely on Bingham's recommendations. Bingham was not familiar with the accounts and representatives in the old BMG and therefore depended heavily on the input of district managers Scott Miller and Jay Anders, and to a lesser extent on input from Regional Director, Ryan Sothan.
Bingham held a series of meetings with Miller and Anders, which Sothan sometimes attended, to discuss accounts and sales representatives. During this selection process, Bingham and the other managers did not post any positions, did not consult any personnel files, did not review the representatives' sales statistics, nor conduct any interviews. No one consulted an affirmative action plan. Early on, Bingham stated that there were three representatives she did not want to discuss as possible transfers to the new BMG: Rhonda Kriss, Steve Conlin, and John Ross. It is unclear how emphatic she was on this point since Sothan and Anders do not recall her making the comment. Bingham testified at trial that she had a bad impression of Kriss from the TRO incident and did not want her to transfer. She also testified that if Miller had pushed for Kriss, she would have been willing to enter the debate and examine Kriss' personnel file, performance reviews, and so on. Miller did not raise any objection to Kriss being excluded. He did not point out her superior sales performance or awards that would have reflected favorably on Kriss. At the same time, he withheld negative information about the male representatives.
Eventually, five men were selected to transfer to the New BMG: Jim Lysinger, Larry Fisher, Steve Bush, Randy Bryson, and Jeff Jelinek. Kriss was not selected. When she inquired with Miller why she was not chosen, Miller stated that it was a "management decision".
Kriss and the other representatives who were not selected were assigned to the NSD. Also as part of the reorganization, in September 1990, a woman manager, Kelly Heim, was assigned to the NSD to manage Kriss and the other representatives. Ryan Sothan continued as Regional Director.
Kriss was unsure about the earning potential and professional opportunities available in the NSD. Eventually, however, she expressed enthusiasm for her new assignment. Kriss wrote to her new manager Kelly Heim on September 7, 1990 to express her excitement about the opportunities in the NSD and to offer several suggestions for the NSD, including the creation of a Senior Sales Representative position to recognize more experienced sales representatives like herself. Heim responded positively to the letter and indicated she would pursue the suggestions. For the next several months Kriss worked in the NSD, and according to Heim, made significant contributions to the division.
Despite her success in the NSD, Kriss remained disappointed about not calling on bigger accounts because of the professional challenge and the potential income they could generate. On December 6, 1990, Kriss submitted a letter of resignation to Heim effective January 7, 1991. She indicated that she was accepting a position with Apex Leasing, a new employment leasing company begun by Steve Conlin, a former Sprint sales representative in the old BMG.
Kriss completed an exit interview prior to leaving Sprint. In the interview, Kriss indicated her displeasure with the management support she received from Scott Miller. She also indicated that her current management team of Kelly Heim and Ryan Sothan were supportive and interested in developing her career at Sprint. While her disappointment at the reorganization and the size of the accounts in the NSD contributed to her leaving, so did the new opportunity with Apex leasing. Plaintiff believed there was a large market for such services and that the position had the potential to be very lucrative. *1357 According to the business plan she developed with Conlin, she projected she would earn $70,000 in the first year and $150,000 in the second year.
Kriss began with Apex in January 1991, but its business did not take off as she had expected. A month later, in February 1991, Kriss was contacted by MCI Communications, Company. Discussions between them continued, and in March 1991, just three months after leaving Sprint, Kriss accepted a position with MCI that was comparable to a position in the New BMG.

II.
After receiving the evidence in a case, the court must first determine whether the "mixed motives" framework set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), or the burden shifting scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) most properly applies to the evidence before it. Price Waterhouse v. Hopkins, 490 U.S. 228, 278-79, 109 S.Ct. 1775, 1805, 104 L.Ed.2d 268 (1989) (O'Conner, J. concurring); Beshears v. Asbill, 930 F.2d 1348, 1353-54 (8th Cir.1991). The court is required to make a specific finding in this regard. Stacks v. Southwestern Bell Yellow Pages, Inc., 996 F.2d 200 (8th Cir.1993) (per curiam).
Under the Price Waterhouse test, a plaintiff must show that gender was a motivating factor in the employment decision. If this is done, the burden of persuasion shifts to the employer who must show that "it would have made the same decision even if it had not taken the [illegitimate criterion] into account." Stacks, 996 F.2d at 202 (quoting Beshears v. Asbill, 930 F.2d 1348, 1353 (8th Cir.1991)). Under the McDonnell Douglas test, the burden of persuasion never leaves the plaintiff, and 1) the plaintiff must present a prima facie case; 2) the defendant must rebut the prima facie case by showing nondiscriminatory reasons for the decision; and 3) plaintiff must show the proffered reasons are pretextual. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).
Merely establishing a prima facie case of discrimination is not enough to invoke the Price Waterhouse framework. Radabaugh v. Zip Feed Mills, 997 F.2d 444, 448-49 (8th Cir.1993).
Rather, the plaintiff must "present evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employment decision."
Id. at 449 (quoting Ostrowski v. Atlantic Mutual Ins. Co., 968 F.2d 171, 182 (2d Cir. 1992). Plaintiff must show the discriminatory animus was at least one of the "motivating factors" in the employment decision; she need not show it was the sole or principle factor. Price Waterhouse v. Hopkins, 490 U.S. at 247, 109 S.Ct. at 1788. Upon review of the evidence, it appears the Price Waterhouse framework is appropriate here because Scott Miller was closely involved in the decision making process, and there is evidence of his discriminatory attitude that makes it more likely than not gender was a motivating factor in the decision of who should transfer to the New BMG.
The evidence established Scott Miller was closely involved in the process of deciding who would transfer to the New BMG. Bingham herself testified that she relied heavily on the managers' assessment of the sales performance of the representatives who transferred. In the course of evaluating the candidates, Bingham did not consult personnel files or sales information. She conducted no interviews. Bingham testified that her role was information gathering and that she relied on the managers with day to day knowledge of the candidates.
Besides Bingham's testimony, other evidence supports the finding that Miller was closely involved in the decision making process. Jay Anders told John Ross that Miller made the decision about who would transfer. When Ross was trying to appeal the decision not to transfer him to the New BMG, Ryan Sothan listed Miller, not Bingham, as one of the individuals to see. Documents relating *1358 to the accounts to transition also reflect tremendous input from the individual managers.
Besides being an integral part of the decision making process, the evidence also established that Miller demonstrated a discriminatory animus towards women. Miller made derogatory comments about women and called certain women in the office "ugly" and "bitch". His statement at the Western Pro Bowl Awards dinner that one of the younger woman sales representatives "was not ready to run with the stallions", also reflects a discriminatory attitude towards women. The evidence established that Miller was not as accessible to the women sales representatives as he was for the men, and had a poor record of retaining women sales representatives. Miller fueled a male-dominated atmosphere in the office by such things as emphasizing sports with male employees, inviting the "tie lady" to sales meetings, and offering gift certificates to a men's clothing store as sales incentives.
Miller's discriminatory animus affected the decision making process. Bingham's perception of the TRO incident was not based on complete information, and reflected Miller's failure to support his women sales representatives. One of the primary sources of friction between Bingham's NAD staff and Kriss, was the feeling that the TRO orders were not real. On Thursday afternoon, Kriss had not given the NAD staff complete information in that she did not inform them of the orders TRO had placed with the other carriers. By Friday morning, however, Miller was aware of the other orders and the fact that Kriss started the paperwork. Kriss informed him of this on their way to the customer presentation at TRO. Miller was there throughout the presentation at TRO, and was fully aware that at the conclusion of the meeting, no final decision on the orders had been made. Despite this, knowing that Kriss would out of town for the next few days, Miller did nothing to follow upon the orders or prevent the NAD staff from worrying about the paperwork. He did not cancel the orders, did not inform the NAD staff that the orders were contingent and that others had been placed with rival carriers, or change them to a service other than VPN. Miller's inaction demonstrates a tacit approval of Kriss' decision to submit the orders. At the time she wrote her memo criticizing Kriss, Bingham was unaware of Miller's knowledge of the orders and his failure to address the situation with NAD staff.
Not only did Miller fail to make any efforts to avert the difficulties with the NAD staff at the time of the incident, he failed to fully inform Bingham of all the relevant details surrounding the situation after receiving Bingham's memo. Miller met with Bingham after receiving her memo but did not tell her he had known on Friday that paperwork had begun on contingent orders and he had done nothing to stop it or to advise NAD of the situation. Miller told Bingham of Kriss' family stress and the fact she was out of town, but did not relay the facts that showed his tacit approval of the submissions. This atmosphere of misunderstanding was exacerbated by Miller's waiting three weeks to meet with Kriss, his refusal to show her Bingham's memo, and his direction to her not to speak with Bingham and that he would "straighten things out".
Miller's discriminatory animus further manifested itself in the reorganization meetings with Bingham. Bingham relied on Miller and Jay Anders for input on the sales performance of the candidates, yet Miller never informed her of Kriss' excellent sales performance and stack rankings. For instance, he did not inform Bingham that at the time of the reorganization, Kriss was ranked # 1 in the Minneapolis office in booked revenue, and # 2 in real revenue. He also withheld negative information on the male candidates he favored. For example, he did not inform Bingham of the negative action taken against Jim Lysinger for signing on behalf of the customer on certain Sprint forms. Miller's failure fully to inform Bingham of the details surrounding the TRO orders, both at the time of the incident with the support staff and after receiving Bingham's memo, as well as his failure to present Bingham with positive information regarding Kriss and his withholding negative information about the male candidates, injected Miller's discriminatory animus into the process of deciding who should transfer to the new BMG. His influence on the decision making process makes it more likely than not that *1359 his discriminatory attitude was a motivating factor in the decision.
Once a plaintiff has shown that a discriminatory animus was a motivating factor in the decision making process, defendant may avoid liability only if it can prove by a preponderance of the evidence that it would have made the same decision even if the illegitimate criterion had not been taken into account. Price Waterhouse, 490 U.S. at 258. Sprint argues that regardless of any discriminatory attitude Miller may have injected into the selection process, Bingham would have made the decision to exclude Kriss because of her personal assessment of Kriss through the TRO account. The court is not persuaded by this argument.
Bingham testified that if Miller had raised the issue she would have been willing to enter the debate concerning Kriss' candidacy for the new BMG. If Bingham had entered such a debate, the results of the selection process could easily have been different. Kriss had higher stack rankings and sales figures than most of the candidates eventually chosen. She had received praise from customers and company recognition for her performance. While there were some negatives in her personnel file, if viewed with full knowledge of the negative material in the other candidates' files, Bingham may well have chosen Kriss for the new BMG. Defendant has not shown that the same decision would have been made without Miller's injection of a discriminatory animus into the New BMG selection process, and therefore Kriss has proven her failure to promote claim under Title VII, 42 U.S.C. § 2000e et seq. and the Minnesota Human Rights Act Minn.Stat. § 363.01 et seq.[5]

III.
Kriss argues that her resignation from Sprint in December 1990, was really a constructive discharge because her situation at Sprint was intolerable. The court does not agree. To constitute a constructive discharge, the employer must create a situation where a reasonable person in the employee's position would find the conditions intolerable. Johnson v. Bunny Bread, 646 F.2d 1250, 1256 (8th Cir.1981). Plaintiff need not prove that the employer consciously intended to force the employee to quit, rather, an employer is held to intend the reasonably foreseeable consequences of its actions. Hukkanen v. International Union of Operating Engineers, 3 F.3d 281 (8th Cir.1993).
In Hukkanen, an employer repeatedly sexually harassed plaintiff by propositioning her, touching her breasts and otherwise forcing himself on her physically. Id. at 285. He even brandished a gun and threatened to rape her. Id. The court found that this was an intolerable working condition and that a reasonable person in Hukkanen's position would have felt compelled to quit. The court found the necessary intent on the part of the employer because it was reasonably foreseeable that a person in Hukkanen's position would feel compelled to quit. Id.
Here, Kriss argues that she was embarrassed and humiliated at not being selected to the New BMG and being limited to calling on the smaller NSD accounts. She also contends that the selection process indicated that she would not have any possibility for future advancement within Sprint.
While Kriss was undoubtedly embarrassed at not being selected, the evidence does not support her contention that the situation in the NSD was intolerable or without possibilities for advancement. Kriss was no longer working for Scott Miller. She herself stated in her exit interview that her NSD manager Kelly Heim and Regional Director Ryan Sothan were excellent. Barely three months *1360 had passed since the reorganization, and the transition to the new structure was still in progress. Kriss had written a letter to Heim expressing excitement about the prospects of working with her in the NSD. Heim had responded positively to Kriss' suggestion for creating a senior sales representative position, so there was a possibility for Kriss to be promoted within the NSD. Heim and Sothan were also supportive of Kriss' efforts for advancement outside the NSD. Both wrote letters of recommendation for her when she applied for a position with Sprint Data Serve. While ultimately she was not selected for that position, it was not due to lack of support from her managers. As for compensation, while her potential earnings in the NSD were not as great as they would have been in the New BMG, they were still significant. At the time of her resignation, the compensation plans were still evolving and it was unclear exactly what the earning potential in the NSD might be.
A significant factor in Kriss' departure from Sprint was her opportunity at Apex Leasing. Kriss predicted she would earn $70,000 in the first year and $150,000 in the second. As an independent contractor, she would basically work for herself. Kriss testified in her deposition that her offer at Apex was a factor in her leaving Sprint, and that if she had not had the offer, she probably would have stuck around until something else came along.
In light of the Apex offer, her good relationship with her new manager and regional director, the possibility for significant earning power, and the support of her management in efforts for advancement both within and outside the NSD, plaintiff's situation in the NSD was not such that a reasonable person would find it intolerable, and therefore Kriss was not constructively discharged when she submitted her resignation in December 1990.

IV.
Kriss was denied a promotion because of her gender and is entitled to compensation for that violation of her rights under Title VII and the Minnesota Human Rights Act. She is not entitled to back pay after the effective date of her resignation (January 7, 1991), however, because she was not constructively discharged by Sprint.
Based on the record and all evidence at trial, it appears that plaintiff received almost as much compensation in 1990 as she would have received if she had transferred to the New BMG. This is because through the end of 1990, the New BMG representatives remained on the same compensation plan that was in effect before the reorganization. The New BMG representatives had in effect two territories for the fourth quarter of 1990. First, they continued to be paid on their former accounts in the old BMG. Second, they were assigned a New BMG territory consisting of at least some of their old BMG accounts, plus new accounts assigned because of the reorganization. For pay purposes in the fourth quarter of 1990, Sprint compared the compensation for both territories and paid the representative the higher of the two.[6] Some of the New BMG representatives did better under their old BMG territory, and others did better with their New BMG accounts.
The court finds it more likely than not that Kriss would have worked harder in the fourth quarter if she had been promoted to the New BMG instead of being passed over, and would have made some new account sales during the quarter that would have entitled her to compensation above what she already received under her old BMG territory. The court finds the amount of lost compensation for Kriss in 1990 is $10,000 in commissions and benefits.
Under Minn.Stat. §§ 363.14 subd. 2 and 363.071 subd. 2, the court may award compensatory damages in an amount up to three times the actual damages sustained. Treble damages are a fixed multiple of compensatory damages and are not related to the culpability of the employer. Melsha v. Wickes Companies, Inc., 459 N.W.2d 707, 709 (Minn. Ct.App.1990). Consideration must be given to whether a multiple is necessary for the victim to be completely compensated. Id. *1361 Under the circumstances, treble damages are necessary to compensate Kriss fully for Sprint's failure to promote her and, she is entitled total compensatory damages in the amount of $30,000.
The statutory scheme also provides for other damages and recovery of fees. The court finds that Kriss is entitled to damages for the mental anguish and suffering she experienced as a result of the discrimination. Given the loss of prestige and embarrassment at not being selected, as well as the frustration caused by the discriminatory conduct of Scott Miller, the court finds Kriss is entitled to $20,000 in emotional damages. She may also recover her reasonable costs and attorney fees.
Finally, the court is required to assess a civil penalty payable to the State of Minnesota against any defendant found to have violated the MHRA. Minn.Stat. §§ 363.14 subd. 2 and 363.071 subd. 2. The amount of the penalty is determined by "taking into account the seriousness and extent of the violation, the public harm occasioned by the violation, whether the violation was intentional, and the financial resources of the [defendant]." Minn.Stat. § 363.071 subd. 2. Here, the evidence showed that Miller intentionally discriminated against Kriss because of her gender which affected the promotion process. The extent of the violation is somewhat mitigated by the fact that not all Sprint managers had a discriminatory animus. This is offset, however, by the failure of Bingham and the rest of Sprint's management personnel to consult an affirmative action plan during the selection process for the New BMG. Based on all the factors set forth in the MHRA, the court assesses a civil penalty against Sprint in the amount of $25,000.

ORDER
Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that:
1) plaintiff's motion in limine regarding remaining evidentiary objections is denied;
2) plaintiff's motions for sanctions, to strike evidence presented at trial, and to strike the answer are denied;
3) defendant's motion for involuntary dismissal is denied;
4) judgment shall be entered in favor of the plaintiff and against the defendant in the amount of $50,000 for damages;
5) plaintiff shall be awarded reasonable costs and attorney fees. Plaintiff shall submit an itemized application for attorney fees with supporting documentation, time sheets, and explanations which reasonably detail her fees and costs by May 2, 1994. Defendant shall respond by May 23, 1994;
6) defendant shall pay a civil penalty to the State of Minnesota in the amount of $25,000; and
7) Sprint shall cease and desist from any discriminatory conduct and submit an affidavit detailing the steps it has taken to implement its stated affirmative action policies.
LET JUDGMENT BE ENTERED ACCORDINGLY.
NOTES
[1] Objections to several exhibits were not ruled on during trial. After review, the objections to plaintiff's # 110 and 112, copies of Sprint's Affirmative Action plans, are overruled. The remaining objections to certain damages exhibits (plaintiff's # 190, and defendant's # 190, 191, 192, 201, 202, 203, 204, 205, 206, 207, and 208) are also overruled. Each side altered its damage analysis at trial, and the court took steps, such as giving plaintiff time to prepare for the cross examination of Sherron Jones, to mitigate surprise to either side.
[2] A PBX is a computer that controls a phone system.
[3] Plaintiff has moved to strike Sprint's defense that plaintiff was not qualified for the New BMG because Sprint did not identify this as a defense during discovery. Because it finds plaintiff was qualified, the court does not reach the issue of whether the defense should be stricken.

Plaintiff's additional post trial request for sanctions against defendant for abuse of discovery should also be denied. Plaintiff was not prejudiced by any lack of discovery related to her qualifications because the court has found she was qualified. Moreover, the court excluded many of the late-produced documents. Plaintiff also requests compensation for expenses associated with the deposition of Sherron Jones, because her trial testimony differed so much from the deposition as to make it worthless. Jones' trial testimony did differ from her deposition, but that was due in large part to changes in plaintiff's testimony on damages. Plaintiff used the prior deposition testimony on cross examination for impeachment. Under all the circumstances, the Jones deposition was not worthless, and sanctions are not warranted.
[4] Kriss testified that in the past she had worked with support person Mike Ahola and submitted orders without exact PBX information. She entered common PBX specifications as "default information" which she could change later in the order process.
[5] While the court feels that the Price Waterhouse mixed motives analysis is the most appropriate, it notes that the result would be the same under the traditional burden shifting analysis of McDonnell Douglas. Plaintiff has established a prima facie case of discrimination because she is a member of a protected class, she was qualified for a position in the New BMG, she was denied the position, and the position was awarded to non protected class members. Sprint's articulated non-discriminatory reason for its failure to transfer Kriss is that it was Margie Bingham's decision, not Scott Miller's. As discussed earlier as part of the court's mixed motive analysis, Scott Miller's significant role in the selection process and Bingham's heavy reliance on the input of Miller and Anders, renders the proffered reason pretextual. Defendant's presentation at trial effectively marshalled all available evidence to focus on Bingham as the sole decision maker. In the end this was not persuasive, however, for the reasons stated.
[6] See, Defendant's exhibit 204 "Fourth Quarter Incentive Compensation Question and Answer Review".